Joe Marks and Ruby Marks v. Commissioner.
Marks v. Commissioner
Docket No. 5098-64.
United States Tax Court
T.C. Memo 1968-14; 1968 Tax Ct. Memo LEXIS 283; 27 T.C.M. (CCH) 80; T.C.M. (RIA) 68014; January 22, 1968. Filed *283 Petitioner Ruby Marks is a practicing gypsy palmist. She persuaded Thomas Entsminger during 1959 that he suffered from stomach cancer and that his illness was attributable to an obsession for money which offended certain spirits. She suggested that he turn over $5,000 to her which she would offer up to the offended spirits to be cleansed of his avarice and then returned. After he did so, this amount was appropriated to Ruby's own use and never returned to Entsminger. This income was not reported on the joint return for 1959 which she filed with her husband. Held: Respondent's deficiency determination based on an addition to income of $5,000 is upheld. J. Harlan Stamper, 17th Floor, Bryant Larry K. Hercules, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined a deficiency in petitioners' income tax for the taxable year 1959 in the amount of $1,156.52. The only issue presented for decision is whether petitioner Ruby Marks received $5,000 in unreported income from Thomas W. Entsminger. Findings of Fact A few facts were stipulated and are found accordingly. Joe and Ruby Marks are husband and wife with residence *284 at time of filing the petition herein and at time of trial in Kansas City, Kansas. They filed a joint Federal income tax return for the year 1959 with the district director of internal revenue at Kansas City, Missouri, and during 1959 they resided at 9018 Winner Road, Independence, Missouri. Ruby and Joe Marks are gypsies, and Ruby, hereinafter referred to as petitioner, is a practicing palmist. She has used the professional names of Madam Lamara and Sister Mary. Joe Marks assisted Ruby in her palm reading business. He arranged to have handbills printed advertising his wife as an adviser on all the affairs of life; as a person who could solve any problem, no matter how difficult; as a person who guaranteed that she could remove evil influences and bad luck; as a person who could reunite the separated; and as a person who could instruct one who has failed in life so that he might be able to hold a job and succeed. Joe does not otherwise appear to have assisted petitioner with her palmistry business. He owned and managed small apartment buildings. In early April 1959, Thomas W. Entsminger and his wife Violetta went to petioner's place of business for the first time to have their *285 palms read. At that time he was having stomach trouble and she suffered from a heart condition. Violetta, as a young girl of about 16 years, had visited a palmist once before. The record does not positively indicate if Thomas, a long-time employee of the Kansas City Power and Light Company, had ever before visited a palmist, but it is clear that he had never before had much first-hand contact with gypsies, the spirits or the occult. He had been reared in the country and knew that among farmers gypsies were not highly regarded for honesty, but he did not know that petitioners were gypsies. In the course of their professional relationship which later developed, petitioner denied to Thomas that she was a gypsy, stating that she had been born in India. Petitioner's handbills also stated that she had "just come from India - the land of miracles." At the time of trial both Thomas and his wife were 71 years old; in April of 1959, they would both have been approximately 63 or 64 years old. After their first visit, and at petitioner's request, the Entsmingers returned to petitioner's business establishment. Their second visit followed the first by about two days. On the second visit petitioner *286 informed the Entsmingers that certain spirits with whom she had been in contact had advised her that Thomas had stomach cancer. It seemed that these spirits had placed curses on Thomas or were otherwise determined to bring him to no good end. As matters developed it turned out to be petitioner's function to communicate with the 81 meddlesome spirits and discover just what it was about Thomas that proved so offensive to them. She thus did not leave Thomas bereft of all hope that he might be restored to good health. She informed him that she had been born with seven veils over her head, which quirk of fate endowed her with power to intercede for the living with the dead. As a sampling of her amazing abilities, petitioner took from Thomas during the second visit a one dollar bill which she tore into several pieces, appearing to wrap them in a handkerchief. She requested that the Entsmingers take the handkerchief home and place it under a pillow. This they did. Lo and Behold, the dollar bill was intact when the handkerchief was subsequently opened. This was a favorable omen indicating that Ruby could help with the Entsmingers' problems. About three days later, the Entsmingers returned *287 for a third visit with petitioner. At this time petitioner ripped up a five dollar bill in the same manner as she had torn up the one dollar bill during the second visit. She wrapped the pieces in a handkerchief. Simlilrly, and pursuant to Ruby's instruction, the Entsmingers took the handkerchief home and placed it under a pillow. The next morning they were pleased to find that the handkerchief contained an intact five dollar bill. According to petitioner this was a further good sign indicating that she could be of real help to the Entsmingers with their problems. Pursuant to petitioner's request the Entsmingers returned for a fourth visit approximately one week later. During this fourth visit, in order to indicate her honesty to the Entsmingers and to demonstrate their faith to hostile spirits, petitioner requested that they leave three 20 dollar bills with her which she would place in her Bible. The Entsmingers complied with this request and were pleased to find on their return for a fifth visit, approximately one week later, that the three 20 dollar bills were extant and that petitioner was returning the $60 to them. It was explained that this was at the direction of the spirits. *288 More important than the mere return of the money was the discovery petitioner indicated she had made concerning Thomas' stomach cancer. She told the Entsmingers that a curse had been removed from the particular three bills which had been placed in the Bible, and that the whole trouble with Thomas was simply that he had an obsession for money. The concerned spirits desired his demise - all owing to his unfortunate and all too common miserly obsession. The remedy, however, was as logical as it was obvious. Thomas had only to wash his hands of the dirty green paper which was the root of his difficulty; the curses would them be removed from it and he would soon be well. Petitioner suggested that $10,000 would be a nice round sum for the Entsmingers to bring when they returned for their next visit, and that the spirits would cleanse this amount just as they had cleansed the three 20 dollar bills which had been placed in the Bible. Thomas then indicated that he could only raise $5,000. Petitioner was not sure if this lesser sum would be enough, but after further consultation with the spirits, indicated to the Entsmingers on approximately their sixth visit that the lesser amount would *289 suffice. The Entsmingers were thus instructed to bring this sum along on their next visit. The Entsmingers returned to petitioner's business establishment on or about May 8, 1959, for their seventh visit. They brought with them the needed $5,000 as well as a live chicken which petitioner had also asked them to procure. The $5,000 was raised primarily from a savings account which Thomas maintained in a power company employees' credit union. $4,000 was withdrawn from this account on May 7th. The remaining $1,000 was raised by Entsminger from miscellaneous sources, including cash on hand at home, some funds of his children and savings bonds. Upon arrival at petitioner's place of business on May 8th, the Entsmingers were witnesses to a more elaborate performance than had been provided them on their prior visits. Before the $5,000 was handed over, petitioner requested that Thomas spit in the chicken's mouth. Petitioner explained that if the chicken then died, everything was going to be all right as far as the spirits were concerned. The death of the chicken would be a good omen. Thomas spat into the chicken's mouth and apparently a short time later the chicken did in fact die. Petitioner *290 was holding the fowl at the time. There is no positive indication in the record as to the cause of death or whether or not Thomas was impressed thereby. However, after the chicken had expired and the omens were deemed favorable, he promptly turned over the $5,000 to petitioner. 82 In any event, petitioner now had $5,000 in green notes of the Entsmingers' money. As a palliative to the spirits who had rather hoped for $10,000, petitioner graciously volunteered to add $2,000 of her own money in order to make the spirits feel better about the offering. Petitioner also indicated to the Entsmingers that eventually the spirits would double the money which they so trustingly were offering up and return it to Thomas and Violetta. She then explained that her $2,000 was to be paid back when this increase occurred. The total roll of $7,000 was carefully and tightly wrapped and tied; it was then placed in a pan and set on fire. A flash occurred and the pan and contents were quickly removed from the room by the present Judy Marks Lane, petitioner's daughter, who assisted in the above-described operation. Judy also removed the dead chicken. The Entsmingers never observed that any of the *291 money was actually consumed by fire. Petitioner finally gave Thomas and Violetta to understand that the last step would be simply to bury the dead chicken and the ashes of the money at midnight in a cemetery. Thereafter they would await spirit action to restore and double the money and return it to a bag which the Entsmingers were to prepare and keep beneath their mattress at home. As will be hereinafter related, they awaited this event in vain and in fact were left holding the bag. After thus arranging for Thomas' good fortune and health, petitioner felt the Entsmingers might see their way clear to add a small gratuity beyond the $5,000 they had already unknowingly contributed. After several subsequent sessions in which progress reports were made on her battle with the spirits, petitioner told the Entsmingers that the $2,000 she had added to their $5,000 represented all the money she had in the world, and that her family needed a television set for amusement. Petitioner had a number of young children at home and was going to have to leave them because of trips required by her work with the spirits. The Entsmingers were encouraged to buy petitioner a television set in return for *292 the $2,000 advance and the good efforts petitioner had expended and was continuing to expend on their part. The cost of the television set was to be later deducted from petitioner's share of the money which the spirits were going to return at the rather attractive interest rate mentioned above. Thomas was persuaded, and the Entsmingers, accompanied by Judy, who was delegated by the family to make a proper selection, went to a Sears Roebuck store and chose a television set which cost in excess of $300. The set was purchased by Entsminger and delivered to petitioner's home. After the spirits had failed for a considerable time to return any of his money, Thomas began to question petitioner as to when he might expect some action in this most intangilbe and elusive of investments. Petitioner let it be known that Thomas was again offending the spirits, this time with his lack of trust and impatience. Thomas slowly began to grow disillusioned with petitioner, and the Entsmingers repeatedly requested petitioner to return their $5,000 or to negotiate the return of it, together with the promised increment. Thomas finally made it clear that he was willing to forget about the promise that his *293 $5,000 would be doubled; he advised petitioner that he would be satisfied with return of the mere $5,000. Again and again the Entsmingers were put off by petitioner's lament that their impatience was only making the spirits more recalcitrant. Also from time to time delay was occasioned by petitioner's absence on extended trips. The stalling continued over several years. Eventually, Thomas realized that he had been swindled and consulted the sheriff in whose jurisdiction the skillful flimflam and legerdemain described above had occurred. Unfortunately, he discovered that the criminal statute of limitations on the prosecution of fraud had run its course. He had to be content with a civil tort suit to recover the money which had been obtained from him by fraud. Such a suit against petitioner was filed in the Circuit Court of Jackson County, Missouri, and after initial defensive efforts in which petitioners were represented by counsel, the Entsmingers won a judgment in December 1963, of $5,000 actual damages and $5,000 punitive damages. At time of actual trial petitioners did not appear. The award of $5,000 actual damages represents the same amount which Thomas handed over to petitioner *294 on or about May 8, 1959. At the time of the tax trial here involved, no portion of this judgment had been collected. Respondent determined that petitioner's income had been understated by $5,000 derived from palm reading or related activities in 1959. 83 Ultimate Findings of Fact In 1959 petitioner Ruby Marks received taxable income in the amount of $5,000 from Thomas Entsminger. Petitioners failed to include this income on their joint Federal income tax return for that year. Opinion The question presented is purely one of fact - i.e., whether Ruby Marks received $5,000 from Thomas Entsminger. If she did the parties are agreed that the amount received constitutes income to her. As reflected by our findings, we have resolved this question of fact in favor of respondent. Monies obtained by various frauds have been held to constitute income, even though they were not lawfully obtained. See e.g., (C.A. 8, 1955); (C.A. 8, 1954); and (C.A. 8, 1953). The holding of these cases has been considerably strengthened *295 by the Supreme Court's decision in , which expressly overruled , in holding embezzled funds includable as part of the embezzler's gross income. Petitioners, recognizing this, concede that if we find that petitioners received the $5,000 from Entsminger it is taxable income to them in 1959. Petitioner's argument is simply that Thomas and Violetta never called on her professionally more than twice, and that the $5,000 in question was given to her daughter, Judy, as a gift from Thomas. She argues and attempted to prove at trial that she never received any money from the Entsmingers beyond her two-dollar fee for two visits. In connection with the gift allegation, petitioner alleges that Thomas was romantically or sexually involved with her daughter, Judy, who was 17 or 18 years old during the year in issue. Judy, for her part, testified that she and Thomas had been involved in an affair for over two years, beginning in April 1959, and that she had been in love with Thomas during the relevant period and until she met her present husband. She was married in 1961. Thomas was *296 63 or 64 years old and suffering with a troubled stomach during 1959. Judy was an exotically attractive young woman at time of trial and must have been a lovely young girl in 1959. While Thomas is a pleasant enough fellow, we do not accept Judy's testimony that she was in love with him or that they had any sort of an affair or romantic relationship in 1959. We likewise do not accept petitioner's story to the same effect but regard it as having been made of whole cloth. There is no dispute that petitioners and the Entsmingers first met in early April of 1959. The evidence is conclusive that the $5,000 which admittedly changed hands was paid over approximately one month later. The only dispute is as to whom the money was paid and why. Our findings reflect our conclusions as to those questions. Even if it were love at first sight between Thomas and Judy or a whirlwind courtship of a "September Song" nature, we are impressed with the inherent improbability of petitioner's story of a love gift of Entsminger's life savings to Judy within such a short time of their first meeting. The fabric of this alleged love affair was riddled with holes by the evidence of record. In addition, petitioners' *297 witnesses (including Ruby, Joe, and Judy) were uniformly unimpressive in candor, credibility and demeanor. They were contradictory and evasive on cross-examination and in our judgment their credibility was almost totally impeached by respondent's cross-examination and by the other witnesses and documentary evidence. For example, and without attempting to detail all conflicts, Ruby denied ever claiming to have supernatural powers or that she had been born in or a visitor to India; but Thomas' testimony and her handbill clearly show that she made these claims. She denied having a criminal record; it was demonstrated that she did have one. She denied ever performing certain tricks, and particularly the ripping up of money mentioned in our findings or the use of chickens; however, another disinterested witness, Gladys Keyes, testified that these very tricks had been employed on her and that she had been somewhat similarly swindled out of $2,500. We believe Gladys Keyes. She was a candid, believable and impressive witness with no interest in the outcome of this litigation. Gladys went to the District Attorney before the statute of limitations on criminal prosecution expired and was able *298 to get her money back from petitioners. Ruby's testimony was flatly contradicted by Gladys' candid, if embarrassing, recital of her folly. It is not too much to state with respect to petitioners' testimony and that of their other witnesses that we have rarely encountered persons whose credibility in giving testimony 84 was more open to question. Not only were they vitally interested in the case but they were thoroughly impeached at trial. These conclusions have nothing to do with petitioners' alleged ignorance, illiteracy or unusual background as suggested by theirbrief. They just were not convincing or believable witnesses and no credence can be given their testimony. Thomas and Violetta were respondent's primary witnesses at trial, and we have accepted their story, augmented by some documentary evidence, as the principal basis for our Findings of Fact. While the Entsmingers' memories were not clear as to certain particulars and while Thomas and Violetta did not agree on every detail, we found them entirely credible witnesses. We do not believe Thomas was ever romantically interested in Judy, and doubt that Thomas was even ever alone with her. We conclude that the presumptive *299 correctness of respondent's determination is alone sufficient to sustain his action in determining the deficiency here involved. Petitioners' evidence is far from sufficient to overcome that presumption or to carry their burden of proof. When respondent's evidence is also weighed in the scale, it is obvious that the respondent's determination must be sustained. If he had the burden of proof, which he does not, he would have met it. Petitioner's prefabricated house of cards has been totally demolished even if it had appeared to us as more than a mirage at first glance. We conclude and hold that petitioners received $5,000 in additional income in 1959 which they failed to report in their joint return for that year, and that respondent was correct in his determination to that effect. Decision will be entered for the respondent.